UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COLLIN BLOUNT,

                    Plaintiff,

          v.

DETECTIVE ANGEL SANCHEZ; LIEUTENANT
COMMANDER MICHAEL CULKIN; CITY OF NEW
YORK

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECOND AMENDED
COMPLAINT

1:15-cv-00938-ARR-LB

JURY TRIAL DEMANDED

       Collin Blount, by his attorneys Patterson Belknap Webb & Tyler, brings this civil rights action to redress the deprivation of rights, privileges, and immunities secured to Plaintiff by the Fourth and Fourteenth Amendments to the Constitution of the United States, by Title 42 U.S.C. § 1983, and arising under the law and statutes of the State of New York.

## PRELIMINARY STATEMENT

      1.     Collin Blount spent almost seventeen months on Rikers Island charged with the attempted murder of a person he did not know and had never met. Defendant Detective Angel Sanchez led the investigation and arrested Mr. Blount after the victim picked Mr. Blount out of a photo array. Had Mr. Blount accepted any of three guilty pleas offered to him, this story would have ended there. But Mr. Blount insisted on his innocence. Then, fifteen months after Mr. Blount's arrest, the Assistant District Attorney (ADA) turned over Detective Sanchez's handwritten notes from the investigation. These notes revealed for the first time that—prior to Mr. Blount's arrest—two eyewitnesses to the shooting had identified the shooter as someone else: the godbrother of the victim's friend, Angela Hollins. Detective Sanchez omitted any mention of this eyewitness information from all official police records. However, once his notes

were turned over, defense counsel's search of Facebook quickly turned up a photograph of the person identified as the shooter. That person was not Mr. Blount, and Mr. Blount was released from Rikers Island shortly thereafter. When the same eyewitnesses again identified the godbrother as the shooter, all charges were dropped against Mr. Blount.

2.        This is not a case about a mistaken identification. The case against Mr. Blount was built on fabrications and material omissions that emanated from the 81st Precinct. Detective Sanchez told the ADA that he put Mr. Blount into a photo array based on an "anonymous call" identifying the shooter as "Little C" and that Mr. Blount is known as "Little C" within the 81st Precinct. In fact, there is no record of Detective Sanchez or anyone in the 81st Precinct receiving an anonymous call implicating Mr. Blount. Nor is there any record of Mr. Blount being known as "Little C." The victim's identification is also tainted by Detective Sanchez's misconduct. Hospital records and eyewitnesses confirm that the victim was acutely intoxicated when shot. Although the victim initially disclaimed any memory of the shooter, after meeting with Detective Sanchez, the victim knew details of the crime that were only in Detective Sanchez's handwritten notes. Detective Sanchez's fabrications and material omissions from police records were not oversights; they were part of a practice within the 81st Precinct to suppress and omit information that might hurt crime statistics. Mr. Blount spent almost a year and a half fighting baseless charges. The reason is not due to mistake; it is due to intentional, vindictive conduct for which he now seeks recompense.

## JURISDICTION AND VENUE

3.        This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States. This Court has supplemental jurisdiction over related state law claims under 28

2

U.S.C. § 1367(a) because those claims arise out of the same case or controversy as the federal claims.

4.     Venue is proper under 28 U.S.C. §1391(b) because the events that give rise to Plaintiff's claims took place in the Eastern District of New York.

5.     A Notice of Claim was timely served by the Plaintiff upon the defendant the City of New York on or around February 14, 2014.

6.     The City of New York subsequently conducted an examination of the plaintiff pursuant to General Municipal Law §50-H on or around May 22, 2014.

7.     At least thirty days have passed since Plaintiff's service of his Notice of Claim, and adjustment and payment thereof has been neglected or refused by the City of New York.

8.     The Plaintiff filed a *pro se* Complaint on January 30, 2015, within one year and ninety days after his criminal case was dismissed on December 19, 2013.

## PARTIES

9.     Plaintiff is an adult male citizen of the United States and the State of New York.  At the time of the incidents complained of, he was a resident of Brooklyn, New York.

10.     At all relevant times hereinafter mentioned, defendant City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and its employees.

11.     At all relevant times hereinafter mentioned, defendant Angel Sanchez (Shield No. 2780) was employed by New York City as a member of the NYPD and assigned to

3

the 81st Precinct as a Detective 1st Grade.  He retired from the NYPD in November 2012.

Detective Sanchez is sued in his individual capacity.

12.     At all relevant times hereinafter mentioned, defendant Michael Culkin was

employed by New York City as a member of the NYPD and assigned to the 81st Precinct as a

Lieutenant Commander.  Lieutenant Commander Culkin is sued in his individual capacity.

13.     At all times and in all actions described below, Detective Sanchez and

Lieutenant Commander Culkin were acting under color of state law and within the scope of their

employment as police officers, agents, servants and employees of New York City and under New

York City's supervision, direction and control.

## STATEMENT OF FACTS

*Detective Sanchez's Encounters with Mr. Blount Prior to 2012*

14.     In 2006, Mr. Blount's father, Albert McDuffy, was arrested and charged

with murder for the shooting death of two people in the 81st Precinct.  Mr. Blount, who was 18-

years old at the time of the shooting, was sought as a witness but did not cooperate.

15.     Upon information and belief, Detective Sanchez participated in the

investigation of Albert McDuffy and knew that Mr. Blount was the son of Albert McDuffy.

16.     In 2007 Mr. Blount was arrested in the 81st Precinct and convicted of a

Class C felony for criminal possession of a loaded firearm.  He was sentenced to a term of

incarceration of 42 months.  Mr. Blount was released to the community in April 2010.

17.     After returning to the community in 2010, Mr. Blount was placed on the

NYPD Gun Offenders Monitoring Unit.

18.     Upon information and belief, Detective Sanchez was charged with

monitoring Mr. Blount as part of his detective duties.

19.     Detective Sanchez stopped and frisked Mr. Blount on more than one occasion in 2010.

20.     Sometime in 2010, Detective Sanchez pulled over Mr. Blount while Mr. Blount was driving with a female companion, Kyeshia Adkins.  Detective Sanchez interviewed Ms. Adkins outside the presence of Mr. Blount.  He gave Ms. Adkins his card, and told Ms. Adkins to call him if she had any information about Mr. Blount being around guns.

21.     On or around September 2010, Mr. Blount's friend Tyrone was shot and killed within the jurisdiction of the 81st Precinct.   Mr. Blount was a close friend of the victim.  Mr. Blount voluntarily gave his name to the paramedics and the police officers at the scene of the shooting.

22.     On or around November 2010, Mr. Blount was in police custody on suspicion of committing a misdemeanor offense.  Detective Sanchez questioned him on the murder of Tyrone, saying, in sum and substance, "I know you killed him."  While fingerprinting Mr. Blount on the misdemeanor, Detective Sanchez said to him, in sum and substance, "Next time I get you, I'll have enough to convict you and send you up north with your father."

*July 8, 2012 Shooting of Andrew Velasquez*

23.     On July 7, 2012, Andrew Velasquez was hosting a barbeque at 462 Pulaski Street, Brooklyn New York.  The barbeque began in the early morning hours and continued all day.

24.     On or around midnight on July 8, 2012, Andrew Velasquez received a non-fatal gunshot wound to the lower back.   Five people called 911.  Officers from the 81st Precinct responded to the scene.  Andrew Velasquez was transported by ambulance to Kings County Hospital Center.  One of the first officers on the scene of the shooting was Police Officer

5

Gerald Dwyer.  PO Dwyer traveled with the victim by ambulance to the hospital.

        25.     Upon information and belief, Andrew Velasquez was severely intoxicated at the time he was shot.

Redacted with the Court's permission.

        28.     Andrew Velasquez disclaimed knowledge of who shot him when questioned by PO Dwyer.

*Detective Sanchez Investigates the Andrew Velasquez Shooting*

        29.     Detective Sanchez was the lead detective for the investigation into the Andrew Velasquez shooting.

        30.     Detective Sanchez reported to and took direction from Defendant, Lieutenant Commander Michael Culkin.

        31.     Detective Sanchez arrived at the scene of the shooting shortly after it occurred at or around 12:30 a.m. on July 8, 2012.

        32.     Witnesses informed Detective Sanchez that the victim "was drinking all day" and "drinking since 8am."

        33.     At or around 1:30 a.m. on July 8, 2012, Detective Sanchez interviewed PO Dwyer at Kings County Hospital.  PO Dwyer informed Detective Sanchez that the victim was "highly intoxicated."

        34.     PO Dwyer informed Detective Sanchez that the victim did not know who

shot him.  In his Incident Report Worksheet from the night of the shooting, PO Dwyer wrote: "[the victim] stated to his brother, he had a verbal argument with an unknown perp, when [the victim] turned around perp did shoot him once in the back."

35.     On the afternoon of July 8, 2012, Detective Sanchez returned to the scene of the crime and canvassed for cameras that might have recorded the shooting.  He was unable to locate any video of the shooting.

36.     Detective Sanchez returned to Kings County Hospital and interviewed the victim Andrew Velasquez in the hospital at around 2:30 p.m. on July 8, 2012.

37.     Detective Sanchez made hand-written notes in this interview with Andrew Velasquez noting that the victim:  "Doesn't remember anything.  Was drinking all day.  Doesn't remember any argument.  A lot of people from all over."

38.     On or around July 8, 2012, Detective Sanchez interviewed Angela Hollins, who is also known by the nickname Nana or Nunu.

39.     Angela Hollins was in attendance at the barbeque at 462 Pulaski Street on July 7, 2012 and was an eyewitness to the Andrew Velasquez shooting.

40.     Upon information and belief, Angela Hollins told Detective Sanchez that she is a friend of the victim; that she got into an argument with the victim; and that her godbrother also got involved in the argument.

41.     Detective Sanchez took handwritten notes of his interview with Angela Hollins.  The notes state, in sum and substance: "Arguing CW / Godbrother gets involved Dispute with C/W Points Gun, CW Tell him to shoot him – perp shots (sic) one time."

42.     Upon information and belief, NYPD procedure obliged Detective Sanchez to create an official record of his conversation with Angela Hollins for entry into the NYPD

7

Omniform system, which stores information on arrests and complaints in a centralized database, and to update those records as and when new information became available.

43.     Upon information and belief, Detective Sanchez did not create a Complaint form or any formal police record summarizing his interview with Angela Hollins.

44.     On July 8, 2012, Detective Sanchez interviewed Anthony "Macho" Smith. Mr. Smith was in attendance at the barbeque at 462 Pulaski Street and was an eyewitness to the Andrew Velasquez shooting.

45.     Upon information and belief, Detective Sanchez had a second witness interview with Mr. Smith at some point after July 8, 2012 and took handwritten notes during that interview.

46.     Upon information and belief, Detective Sanchez's handwritten notes from his second interview with Mr. Smith reveal that Mr. Smith informed Detective Sanchez that Angela Hollins's godbrother shot Andrew Velasquez.

47.     Detective Sanchez's official police report of his interview with Mr. Smith omitted material information from his conversation with Mr. Smith.  In an official police report, Detective Sanchez reports Mr. Smith as saying, "I didn't see who did it and I don't want to get involved."

48.     Detective Sanchez failed to create a Complaint form or any police record recording his interview with Angela Hollins and failed to update the police record of his interview with Mr. Smith as part of a policy, custom or practice of the 81st Precinct to suppress and omit information that does not comport with what the officer views as necessary to secure an arrest or conviction.

49.     Lieutenant Commander Culkin signed the Complaint in which Detective

8

Sanchez summarized the interview with Anthony Smith.

50.    Upon information and belief, Lieutenant Commander Culkin discussed the status of Detective Sanchez's investigation of the Andrew Velasquez shooting.

51.    Upon information of belief, Lieutenant Commander Culkin knew about and turned a blind eye to Detective Sanchez's omission of material information from the official police reports of witness interviews.

52.    Upon information of belief, Lieutenant Commander Culkin and Detective Sanchez agreed not to create or amend Complaint forms that conflicted with the version of the facts that, in their view, was most likely to lead to an arrest and the closure of the case.

53.    According to an April 2013 Report of The Crime Reporting Review Committee to Commissioner Raymond W. Kelly Concerning CompStat Auditing, the 81st Precinct encourages the "downgrading and suppression" of complaint reports and omission of material information from the NYPD Omniform system.

54.    According to this same April 2013 Report, the 81st Precinct manipulates information in order to keep crime statistics at a desirable level.  Graham Rayman, *The NYPD Tapes:  Inside Bed-Stuy's 81st Precinct,* VILLAGE VOICE, May 4, 2010; Rocco Parascandola, *Brooklyn's 81st Precinct probed by NYPD for fudging stats; felonies allegedly marked as misdemeanors*, NEW YORK DAILY NEWS, February 1, 2010.

*Detective Sanchez Assembles Photo Array*

55.    On July 13, 2012, Detective Sanchez assembled a 6-person photo array that contained Mr. Blount's photograph.   A photo array is a collection of photographs that is shown to a witness to determine if the witness can recognize a person involved with a given crime.

9

56.     Detective Sanchez assembled the photo array using a 2007 photo of Mr. Blount rather than a more recent mugshot.

57.     At the time he assembled the photo array, Detective Sanchez had no information from which to form a reasonable belief that Mr. Blount committed the July 8, 2012 shooting.  In fact, his investigation had yielded evidence that showed the shooter was another man.

58.     On or around July 26, 2012, Detective Sanchez told the ADA that he received an anonymous call stating that "Little C" shot Andrew Velasquez; that the 81st Precinct knew Mr. Blount to be "Little C" from prior contracts; and that, based on the anonymous tip, Detective Sanchez had been able to put together a photo array.

59.     Upon information and belief, Detective Sanchez never received an anonymous call stating that "Little C" shot Andrew Velasquez.

60.     Upon information and belief, no one from the NYPD received an anonymous call stating that "Little C" shot Andrew Velasquez.

61.     There is no police record, phone record, or any record of any anonymous phone call to the 81st Precinct or to Detective Sanchez between July 8, 2012 and July 13, 2012, the date Detective Sanchez assembled the photo array.

62.     A June 2012 debriefing form placing Mr. Blount on the Gun Offenders Monitoring Unit lists "none" next to the box for a nickname.

63.     Upon information and belief, Detective Sanchez fabricated his statement to the ADA that he placed Mr. Blount in the photo array on the basis of an "anonymous tip."

*Detective Sanchez Administers Photo Array*

64.     On July 22, 2012, Detective Sanchez administered the photo array outside

10

of the presence of a supervisor or any other officer.

65.     The photo array is suggestive.  Mr. Blount's photo stands out from the others because, among other reasons, it is the only one that has a light background.

66.     The victim identified Mr. Blount as the shooter and stated "That's the guy I had an argument with and he pointed a gun at me."

67.     Upon information and belief, Detective Sanchez engaged in behavior to encourage Andrew Velasquez to identify Mr. Blount and to bolster his identification once made. He did not remain neutral.

68.     Detective Sanchez filled out portions of the identification sheet on Andrew Velasquez's behalf.

69.     Sometime in July 2012, Andrew Velasquez recorded a video in the hospital identifying Mr. Blount as the shooter for use in the Grand Jury.  Upon information and belief, Detective Sanchez participated in preparing the victim for this video testimony.

70.     In his Grand Jury testimony, Andrew Velasquez testified in detail about the shooting notwithstanding that he was acutely intoxicated at the time of the shooting.  He testified to details about the shooting that were not known to him prior to his encounters with Detective Sanchez.

*Detective Sanchez Arrests Mr. Blount*

71.     On July 25, 2012, Detective Sanchez issued an I-Card for the arrest of Mr. Blount.  The basis for the I-Card was listed as Criminally Negligent Homicide, PL 125.  It stated "Sought as Suspect Only no probable cause to arrest."

72.     At 10:30 p.m. on July 25, 2012, Detective Sanchez arrested Mr. Blount.

73.     At the time of his arrest, Detective Sanchez stated to Mr. Blount, in sum

11

and substance, "Remember me?  I told you I'd get you on something."

74.     On July 26, 2012, Detective Sanchez wrote a police report recommending that the "case be marked closed with an arrest and no outstanding suspect."  At the time he marked the case closed, Detective Sanchez had suppressed the "godbrother" information he received from eyewitnesses.

75.     On July 26, 2012, Detective Sanchez went to the hospital to show Andrew Velasquez a photograph of Mr. Blount and asked him to confirm that this was the shooter. Velasquez did so.

76.     On or around July 26, 2012, Detective Sanchez conferred with the ADA. Detective Sanchez relayed fabricated and incomplete information about the July 8, 2012 shooting.

77.     Detective Sanchez told the ADA that Andrew Velasquez knew the defendant from the neighborhood.  Upon information and belief, Detective Sanchez had no factual basis to make this assertion.

78.     Detective Sanchez told the ADA that Andrew Velasquez was not initially cooperative but that the victim's family convinced him to cooperate.  Upon information and belief, Detective Sanchez had no factual basis to make this assertion.

79.     Detective Sanchez had no reasonable basis to believe that Mr. Blount was the godbrother of Angela Hollins.

80.     Detective Sanchez had no reasonable basis to believe that Mr. Blount and Andrew Velasquez knew each other.

81.     Detective Sanchez told the ADA partial details about the shooting that he learned from Angela Hollins and Anthony "Macho" Smith without attributing these facts to their

12

proper source.

82.     Based on Detective Sanchez's conversation with the ADA and the eyewitness identification procured through suggestive procedures, Mr. Blount was charged with attempted murder in Kings County.

*Mr. Blount is Indicted and Denied Bail On the Basis of False and Incomplete Information*

83.     On July 27, 2012, Mr. Blount was arraigned on charges of attempted murder.

84.     Upon information and belief, on July 31, 2012, the Grand Jury heard partial, incomplete and false information from Detective Angel Sanchez about the events of July 8, 2012.

85.     On July 31, 2012, the Grand Jury heard unreliable video testimony from Andrew Velasquez identifying Mr. Blount as the godbrother of a friend and as the shooter.

86.     At a bail hearing on July 31, 2012, the ADA advocated for a $1,000,000 bail on account of Mr. Blount being identified by an anonymous caller as the shooter.

87.     The Court set bail at $500,000.  Mr. Blount was unable to meet bail and remained detained on Rikers Island.

88.     The ADA offered Mr. Blount the opportunity to plead guilty on three occasions, offering a plea to 10 years, to 18 years, and again to 10 years.  Mr. Blount turned down all offers and maintained his innocence.   On October 12, 2013, Mr. Blount sat for a polygraph test and passed.

*Mr. Blount Is Identified in a Line-Up*

89.     On August 8, 2012, the ADA made a motion to compel Mr. Blount to appear for a line-up.

13

90.     In an August 31, 2012 Affirmation to compel the lineup, the ADA relied on a partial and fabricated recitation of the facts provided to the ADA by Detective Sanchez. The Affirmation stated, in part, that "[the victim] and the defendant were at a barbeque . . . . [The victim] and the defendant's g-sister (sic) had been arguing over the defendant's alcohol.  The defendant walked away towards Stuyvesant . . .  and returned about 30 minutes later.  At approximately (indecipherable)pm, the defendant approached [the victim] pulled a gun from his waistband and threatened to shoot [the victim]. [The victim] told him in sum and substance that if he was going to shoot him, to get it over with.  [The victim] turned to walk away.  The defendant shot [the victim] in the lower spinal cord.  [The victim] fell to the ground and the defendant pointed the gun at [the victim] as he stood over him.  The defendant pressed the trigger two times while pointed the gun at [the victim] and the bullets did not discharge.  The defendant again fled toward Stuyvesant."

91.     On November 13, 2012, Mr. Blount was produced for a line-up.  The victim picked Mr. Blount out of the line-up.

*Detective Sanchez's Handwritten Notes Are Belatedly Turned Over to the Defense*

92.     On February 14, 2013, Legal Aid wrote to ADA Lindsay Ashwal noting that, if there were "any handwritten notes from Detective Sanchez," they had not been turned over.

93.     The District Attorney did not turn over Detective Sanchez's handwritten notes until eight months later, on October 3, 2013.

94.     Detective Sanchez's handwritten interview notes contained detailed information that Detective Sanchez had omitted from official police reports.

95.     Upon receiving the handwritten notes, Mr. Blount's defense counsel

14

learned for the first time that witnesses had identified the shooter as the godbrother of Angela Hollins.

96.     Mr. Blount's defense counsel conducted a simple Facebook search that immediately turned up a photo of Angela Hollins with her godbrother—someone who is not Mr. Blount.

97.     On October 22, 2013, the ADA subpoenaed Angela Hollins.

98.     On October 23, 2013, Mr. Blount's defense counsel submitted a letter to the ADA attaching a photograph of the godbrother that counsel had obtained from a public Facebook feed.

99.     On November 14, 2013, the ADA wrote an affidavit for a subpoena of Angela Hollins's Facebook page and stated:  "Deponent is further informed by the NYPD that the Facebook godbrotha (sic) photograph was shown to an individual known to the NYC police department and known to have been present at the time of the shooting through conversations with multiple witnesses and that said individual stated that the male depicted in the Facebook Godbrotha (sic) photograph was the individual that shot the victim at the time and date in question."

100.     On November 18, 2013, a Hold Notice was issued wherein Mr. Blount was ordered not to be returned to the custody of the New York City Department of Corrections.

101.     Upon information and belief, on December 9, 2013, a confidential informant identified the godbrother as Namal Colon.

102.     On or around December 19, 2013, all charges were dropped against Mr. Blount.

*Mr. Blount Has Suffered Physically, Emotionally and Financially As a Result of the Defendants'*
*Conduct*

103.    Mr. Blount was incarcerated for almost seventeen months in connection
with a crime he did not commit.

104.    Mr. Blount spent approximately six months in solitary confinement while
detained on Rikers Island.

105.    Mr. Blount feared for his physical safety while on Rikers.  He is five feet
tall and feared being targeted for his size.

106.    Mr. Blount suffered physical and emotional injuries from assaults by other
detainees while detained on Rikers Island.

107.    Mr. Blount had difficulty sleeping and had anxiety attacks while detained
on Rikers Island.

108.    Mr. Blount was separated from his two young children for almost
seventeen months while detained on Rikers Island.

109.    Mr. Blount missed the funerals of family members while detained on
Rikers Island.


## JURY DEMAND

110.    Plaintiff demands a jury trial of all issues capable of being determined by
a jury pursuant to the Seventh Amendment to the United States Constitution and Rule 28 of the
Federal Rules of Civil Procedure.


## FIRST CLAIM FOR RELIEF

(False Arrest and False Imprisonment brought pursuant to 42 U.S.C. § 1983 Against Detective
Sanchez in his individual capacity)

16

111.    By the actions described above, Detective Sanchez, in violation of 42 U.S.C. §1983, deprived Mr. Blount of his rights secured by the United States Constitution to be free and secure in his person and his right to be free from arrest or search, except on probable cause or pursuant to warrant.

112.    Mr. Blount was conscious of and did not consent to his confinement.

113.    The probable cause to arrest and detain Mr. Blount was based upon information Detective Sanchez knew to be false or would have known was false had he followed up on a reasonable investigation of known information from eyewitnesses.

114.    Detective Sanchez had no factual basis to include Mr. Blount in a photo array as a suspect in the July 8, 2012 shooting of Andrew Velasquez.

115.    Detective Sanchez knew at the time of the eyewitness identification that Andrew Velasquez lacked a reliable, factual foundation to identify Mr. Blount.

116.    Given the victim's acute levels of intoxication and his previous statement disclaiming any memory of the shooting, the victim's eyewitness identification would not warrant a person of reasonable caution in the belief that Mr. Blount committed the offense.

117.    Mr. Blount was unlawfully arrested and imprisoned, and, as a consequence thereof, Mr. Blount was injured.

## SECOND CLAIM FOR RELIEF

(Malicious Prosecution brought pursuant to 42 U.S.C. § 1983 Against Detective Sanchez in his individual capacity)

118.    Plaintiff repeats the allegations contained above as though stated fully herein.

119.    Defendant Sanchez initiated a prosecution of Plaintiff without any legal

justification and without probable cause.   Defendant Sanchez caused the commencement and

continuation of criminal proceedings against Plaintiff.  The action was commenced and

continued intentionally and with malice and deliberate indifference to Plaintiff's rights.

120.   The criminal proceedings were terminated in Plaintiff's favor and all

charges against him were dismissed on or around December 19, 2013.

121.   Detective Sanchez lacked probable cause to initiate criminal proceedings

against the plaintiff.

122.   Detective Sanchez hid, disregarded and failed to investigate exculpatory

evidence that would void any probable cause.

123.   Detective Sanchez did not make a complete and accurate statement of

facts to the ADA, and he misrepresented information throughout all phases of the criminal

proceedings.

124.   Detective Sanchez acted with malice to initiate and continue criminal

proceedings against Plaintiff.

125.   Mr. Blount is innocent of the charges brought against him.

126.   As a consequence of the proceeding, Mr. Blount suffered a significant

deprivation of liberty and other injury.

### THIRD CLAIM FOR RELIEF

(Abuse of Process brought pursuant to 42 U.S.C. § 1983 Against Detective Sanchez in his
individual capacity)

127.   Plaintiff repeats the allegations contained above as though stated fully

herein.

128.   Detective Sanchez issued legal process to place Plaintiff under arrest.

18

129.     Detective Sanchez arrested Plaintiff in order to obtain a collateral objective outside the legitimate ends of the legal process.

130.     Detective Sanchez acted with intent to do harm to Plaintiff without excuse or justification.

131.     As a consequence of the aforementioned conduct, Mr. Blount was injured.

### FOURTH CLAIM FOR RELIEF

(Deprivation of Substantive Due Process brought pursuant to 42 U.S.C. § 1983 Against Detective Sanchez in his individual capacity)

132.     Plaintiff repeats the allegations contained above as though stated fully herein.

133.     Detective Sanchez engaged in conscience-shocking conduct by fabricating an anonymous tip to justify placing Mr. Blount into a photo array.

134.     Detective Sanchez engaged in this conduct with the malicious intent to induce the victim to identify Mr. Blount, thereby effectuating a quick arrest and permitting the case to be closed quickly and with minimal effort.

135.     As a consequence of the aforementioned conduct, Mr. Blount was injured.

### FIFTH CLAIM FOR RELIEF

(Deprivation of Procedural Due Process brought pursuant to 42 U.S.C. § 1983 Against Detective Sanchez in his individual capacity)

136.     Plaintiff repeats the allegations contained above as though stated fully herein.

137.     The Due Process Clause of the U.S. Constitution regulates the fairness and the reliability of eyewitness identification procedure.

138.     Mr. Blount has a constitutionally protected interest in a fair photo array identification procedure.

19

139.   Detective Sanchez administered a photo array procedure that violated due process.

140.   The Due Process Clause prohibits officers from falsifying police records when the falsification leads to a deprivation of liberty.

141.   Detective Sanchez falsified police records.

142.   As a consequence of the aforementioned conduct, Mr. Blount suffered a significant deprivation of liberty and other injury.

**SIXTH CLAIM FOR RELIEF**

(Conspiracy Under 42 U.S.C. § 1983 as to Detective Sanchez and Lt. Commander Culkin in their individual capacities)

143.   Plaintiff repeats the allegations contained above as though stated fully herein.

144.   Lieutenant Commander Culkin and Detective Sanchez reached an express or implied agreement to deprive Plaintiff of his constitutional rights.  Lieutenant Commander Culkin and Detective Sanchez knew that the facts relayed on official police Complaint forms were partial and incomplete.  Nonetheless, they agreed to submit and sign off on these partial statements in order to bolster the case against Mr. Blount and to permit the case to be marked closed.

145.   Lieutenant Commander Culkin and Detective Sanchez had a personal stake in cases being marked closed with an arrest.

146.   Having a case marked closed improved arrest statistics and personally benefitted both officers' reputations.

147.   As a consequence of the aforementioned conduct, Mr. Blount was injured.

20

## SEVENTH CLAIM FOR RELIEF

(Failure to Intervene Under 42 U.S.C. § 1983 as to Lt. Commander Culkin in his individual capacity)

148.    Lieutenant Commander Culkin had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

149.    Lieutenant Commander Culkin, despite having a reasonable opportunity to prevent, end, or truthfully report the misconduct to which Plaintiff was subjected, failed to intervene, thereby violating plaintiff's rights under the Fourth and Fourteenth Amendments.

150.    As a consequence of the aforementioned conduct, Mr. Blount was injured.

## EIGHTH CLAIM FOR RELIEF

(Municipal Liability Under *Monell*)

151.    Plaintiff repeats the allegations contained above as though stated fully herein.

152.    At all times materials to this complaint, New York City, acting through the NYPD, had in effect *de facto* policies, practices, customs and usages that were a direct and proximate cause of the unconstitutional conduct of the defendant police officers.

153.    The aforementioned customs policies, usages, practices, procedures and rules of New York City and the NYPD include but are not limited to the following:

(a)    Placing persons into photo arrays without any factual basis to suspect the person of having committed a given offense;

(b)    Assembling and administering photo identification procedures by non-neutral officers in a non-blind manner;

(c)    Arresting persons without probable cause;

21

(d)     Suppressing, omitting and fabricating material information in order to secure an arrest and conviction;

(e)     Providing false, incomplete and fabricated information to prosecutors to defend an arrest.

154.   New York City's arrest, prosecution of, and preparation and use of materially false and incomplete evidence about Plaintiff resulted from and were directly and proximately caused by these policies, practices, and/or customs.

155.   New York City, as a matter of policy and practice, has with deliberate indifference failed to properly sanction, train, supervise or discipline police officers, including the defendants in this case, for violations of the constitutional rights of citizens, thereby causing police officers including defendants in this case, to engage in unlawful conduct.

156.   New York City has demonstrated deliberate indifference to the rights of Plaintiff and all citizens by failing to properly train and supervise police personnel on the proper use of reliable photo identification procedures.

157.   New York City was on notice and faced a choice and chose not correct its policies through training, and never conducted training to prevent or address the problematic policies, and instead, in an exhibition of deliberate indifference, has allowed the activity to continue.

158.   As a consequence thereof, Mr. Blount was injured.

**NINTH CLAIM FOR RELIEF**

(State Law Claims for False Arrest, Malicious Prosecution, Abuse of Process, Intentional Infliction of Emotional Distress)

159.   Plaintiff repeats the allegations contained above as though stated fully

22

herein.

160.    Defendants engaged in extreme and outrageous behavior in the identification, arrest, and indictment of Mr. Blount for attempted murder and this behavior was intentional or reckless and caused severe emotional distress and mental trauma to Mr. Blount.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment in his favor and requests relief against Defendants as follows:

(a)    Actual and punitive damages against each of the individual defendants in an amount to be determined at trial;

(b)    Actual damages against New York City in an amount to be determined at trial;

(c)    Statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law;

(d)    Reimbursement for the cost of the action; and

(e)    Such other relief as the Court deems just and proper.

Dated: Brooklyn, New York
         August 16, 2016

Respectfully submitted,

James V. Masella, III
Helen P. O'Reilly
*Attorneys for Plaintiff*
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2240
jmasella@pbwt.com
horeilly@pbwt.com

23